IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC DePAOLA,                           *

    Plaintiff,                          *

      v.                              *          Civil Action No. DKC-24-733

CAROLYN J. SCRUGGS, *et al.*,           *

    Defendants.                         *

                      ***

## MEMORANDUM OPINION

Self-represented Plaintiff Eric DePaola, an inmate presently incarcerated at Eastern Correctional Institution ("ECI") in Westover, Maryland, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983 against Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Corrections J. Phillip Morgan, Laura Armstead, Warden William Bailey, Chaplain Keith Kitchen, Chaplain Matthew Phillips, Chaplain Geoffrey Gibbs, Sr., and the "Religious Services Unit."  ECF No. 1.  In his Amended Complaint, Mr. DePaola alleges that his right to practice his religion was infringed when he was required to register his religious preference by indicating a particular sect within Islam in order to participate in congregant and other religious activities.  ECF No. 26.  Mr. DePaola seeks compensatory and punitive damages as well as injunctive relief.  *Id.*

Defendants filed a motion to dismiss or, in the alternative, for summary judgment.  ECF No. 31.  The court informed Mr. DePaola, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to the motion could result in the dismissal

of the complaint.  ECF No. 32.  Mr. DePaola filed a response (ECF No. 33) incorporating his previously filed response (ECF No. 22) to Defendant's initial motion to dismiss.[1]

Also pending is Mr. DePaola's Amended Motion for Preliminary Injunction.  ECF No. 27.[2] Defendants have responded to the Motion (ECF No. 33) and Mr. DePaola replied (ECF No. 34).

Having reviewed the submitted materials, the court finds that no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2025).  For the reasons set forth below, Defendants' motion will be granted.  Mr. DePaola's claims asserted against Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Corrections J. Phillip Morgan, Laura Armstead, and Warden William Bailey are dismissed for failure to state a claim.  Summary judgment is granted as to Mr. DePaola's religion and retaliation claims asserted against Chaplain Keith Kitchen, Chaplain Matthew Phillips, and Chaplain Geoffrey Gibbs, Sr.  His request for injunctive relief is denied.

---

[1]    In his opposition, Mr. DePaola asserts for the first time that inmates in general population were permitted to attend Christian services without selecting a religious sect on their Religious Preference Form.  ECF No. 22-1 at 4.  These claims are not properly before the court and will not be considered.  *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd,* 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998); *Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use the memorandum in opposition to amend the complaint).

[2]    Mr. DePaola filed a Motion for Leave to File Amended Memorandum in response to the dispositive motion filed by Defendants in response to his initial Complaint.  ECF No. 28.  Because Mr. DePaola was granted leave to file an Amended Complaint, Defendants' initial dispositive motion was denied without prejudice.  ECF No. 25.  Accordingly, the Motion for Leave to File Amended Memorandum is denied as moot.

## BACKGROUND

### A.     Mr. DePaola's Allegations

In his Amended Complaint, Mr. DePaola states that he has been a practicing Muslim since 2005 and that part of his religious practice requires that he attend weekly Jummah services. ECF No. 26 at 5. He further explains that the Qu'ran prohibits dividing Islam into sects. *Id*. Mr. DePaola contends that Defendants demand that he violate this tenet of his faith by requiring him to declare himself a member of a sect of Islam so that he can participate in Jummah services, fast during Ramadan, and perform other unspecified practices of Islam. *Id*.

Mr. DePaola explains that he arrived at ECI on June 30, 2020, while ECI was on "Restricted Movement Status" due to the COVID-19 pandemic and access to religious and library services was restricted. ECF No. 26 at 6. Because he could only access Department of Public Safety and Correctional Service ("DPSCS") and ECI policy through the prison library he had no ability at that time to learn of Defendants' policy regarding registration of a religious sect. *Id*.

In 2022, before Ramadan began, Mr. DePaola wrote to Chaplain Phillips asking to participate in "Ramadan fasts and feast" and advising Chaplain Phillips that he was Muslim. ECF No. 26 at 6. He did not receive a response and three days after Ramadan began, Mr. DePaola sent another request to the Chaplain seeking to participate in Ramadan. *Id*. Mr. DePaola did not receive a response and did not participate in any Ramadan meals during 2022. *Id*. Instead, Mr. DePaola attempted to observe Ramadan in 2022 by purchasing items from the commissary, but he was "not able to maintain sufficient nutritional and caloric intake eating only commissary and could not sustain the fast for more than one week." *Id*.

Mr. DePaola states that he attempted to exhaust his administrative remedies regarding 2022 Ramadan but "[a]ll attempts failed and the administrative remedy process was rendered unavailable due to no fault of his own." ECF No. 26 at 6. He also asserts that he exhausted his

administrative remedies as to his 2022 Ramadan issue via his 2023 administrative remedy process. *Id.* He avers that he filed Requests for Administrative Remedy ("ARP") on April 10, 2022, and on May 15, 2022, regarding his observing Ramadan but did not receive a receipt or response to either ARP. ECF No. 22-1 at 2-3.

On February 15, 2023, Mr. DePaola wrote to Defendant Chaplain Gibbs asking to participate in Ramadan which was to begin March 22, 2023. ECF No. 26 at 7. He advised Chaplain Gibbs that he was Muslim, and his religion was Islam. *Id.* He did not receive a reply. *Id.* He wrote to Chaplain Gibbs again on March 7, 2023, requesting to participate in Ramadan. On March 9, 2023, he received a Memorandum from Chaplain Gibbs providing Mr. DePaola a Religious Preference Registration Form. *Id.*

The form provides that religious preferences are effective within two weeks following the semi-annual calendar period. ECF No. 26 at 7. Mr. DePaola explains that this meant his request would not be honored until after Ramadan. *Id.* The form directs the applicant to select a "Sect" of Islam and also provides that the applicant can select "Other-Religion not listed." *Id.*

Mr. DePaola wrote to Chaplain Gibbs on March 9, 2023, asking for an in person meeting and restating his desire to participate in Ramadan. *Id.* Ramadan began on March 22, 2023, but Mr. DePaola had not received a response to his request, had not spoken to Chaplain Gibbs in person, and was unable to participate in Ramadan. *Id.* Mr. DePaola again tried to observe Ramadan by purchasing commissary items; however, he was again unable to maintain sufficient nutritional caloric intake and could not sustain his fast for more than a week. *Id.*

Chaplain Gibbs, who identified himself as a Non-Denominational Chistian, called Mr. DePaola to his office on March 30, 2023. ECF No. 26 at 8. He advised Mr. DePaola that he had to fill out the Religious Preference Registration Form in order to participate in Ramadan. *Id.* Mr. DePaola advised Chaplain Gibbs that the Qur'an expressly forbid the division of Islam into sects

and Chaplain Gibbs responded, "Policy will not let you participate in any observance not prescribed by it." *Id*. Mr. DePaola filled out the Religious Preference Form, without selecting a sect, and advised Chaplain Gibbs that he is a Muslim whose religion is Islam. *Id*. Chaplain Gibbs stated that he would have to call Chaplain Kitchen and advised Mr. DePaola that he may need to be listed as "other" on the form, but at least then he could possibly participate in Ramadan. *Id*. Chaplain Gibbs told Mr. DePaola that he would be in contact the next day, but Mr. DePaola was not contacted the next day and was not permitted to observe Ramadan or go to any religious service. *Id.*

Mr. DePaola filed an ARP on April 11, 2023, regarding the denial of his ability to observe Ramadan. ECF No. 26 at 8. As a result of filing the ARP, Mr. DePaola was interviewed by Chaplain Phillips. Chaplain Phillips advised that as of April 11, 2023, Mr. DePaola's religious preference was listed as Islam in the Offender Case Management System. *Id*. He gave Mr. DePaola another Religious Preference Form and directed he select "Other" and list Islam in the blank field of the form. *Id*. In response to Mr. DePaola's question, Chaplain Philips advised that he could also write "no sect" on the form. *Id.* Mr. DePaolo asked if he would now be permitted to participate in religious services, but Chaplain Phillips responded that he would have to find eight other prisoners at ECI who practiced Islam, then they could have services together; otherwise, Mr. DePaola could continue to worship in his cell. *Id*. at 9. Mr. DePaola told Chaplain Phillips that he was not seeking a separate service, that he "practice[d] the same Islam as every Muslim who believes in Allah, his Prophets and follows the Holy Qur'an and Sunnah." *Id*. But Chaplain Phillips replied that he had to follow policy. *Id*.

On May 4, 2023, Defendant Warden William Bailey responded to Mr. DePaola's ARP, denying it. ECF No. 26 at 9. Thereafter, Mr. DePaola filed an Appeal to the Commissioner of

Correction, specifically noting that it was the second year he was denied the ability to practice his religion. *Id.*

Chaplains Kitchen and Gibbs interviewed Mr. DePaola again on August 8, 2023. ECF No. 26 at 9. Chaplain Kitchen stated that he needed Mr. DePaola to withdraw the ARP and that he simply had to list any sect, whether he believed it sincerely or not, and he could participate in religious services. *Id*. Mr. DePaola reiterated that the Qur'an prohibits the division of Islam. *Id*. Chaplain Kitchen offered that he believed Mr. DePaola was sincere but that he was there to enforce policy. *Id*. Mr. DePaola responded that he was seeking a change in policy so that he could participate in religious services that were already being provided. *Id*. Chaplain Kitchen advised that if Mr. DePaola did not select a sect, then his ARP would be denied, and nothing done - the policy would not change. *Id*. Chaplain Gibbs also noted that Ramadan was to begin in a few months and if the issue was not resolved, Mr. DePaola would again not be able to observe Ramadan in 2024. *Id*. at 10.

The Commissioner of Corrections dismissed Mr. DePaola's ARP in September of 2023. *Id*. The Inmate Grievance Office denied Mr. DePaola's appeal in October of 2023. *Id*.

On January 25, 2024, Mr. DePaola wrote to Chaplain Gibbs again notifying him that he is a Muslim, his religion is Islam, and he wished to attend Islamic services. ECF No. 26 at 10. Chaplain Gibbs responded by providing Mr. DePaola another copy of the Religious Preference Registration Form. *Id*.

On March 11, 2024, Mr. DePaola filed this case. ECF No. 1. Ramadan fasting began that same day, but Mr. DePaola was not allowed to receive Ramadan fasting meal trays. ECF No. 26 at 10. On March 15, 2024, Mr. DePaola submitted another request to Chaplain Gibbs to observe Ramadan and attend Islamic services. He was notified that day by officers who were serving

meals, that he was added to the Ramadan Fast List and would receive a Ramadan Meal in the evening. *Id.*

On March 15, 2024, Mr. DePaola received a Ramadan meal. ECF No. 26 at 11. He was added to the Islamic services list and began attending nightly Ramadan prayer service and regular Islamic study/worship services, including Jumma. ECF No. 26 at 11.

Mr. DePaola explains that Chaplain Gibbs is in the same area of the facility where Jumma services take place and that on several occasions he noticed Chaplain Gibbs "looking directly at me." ECF No. 26 at 11.

On May 3, 2024, after Jumma services concluded, Chaplain Gibbs asked Mr. DePaola why he was attending Jumma services. ECF No. 26 at 11. Mr. DePaola responded that he was a Muslim and he was on the pass list to attend the services, but Chaplain Gibbs advised him that he was not supposed to be there and that if he continued to attend services, he would write him an infraction. ECF No. 26 at 11. Mr. DePaola asked to end the discussion and advised other inmates about the interaction. *Id.*

On May 17, 2024, Mr. DePaola was permitted to leave his cell to attend Jumma. ECF No. 26 at 11. He double checked with the security desk to make sure he was on the pass list. *Id.* During the service, Mr. DePaola saw Chaplain Gibbs leave his office, point at Mr. DePaola, and talk to the officers at the security desk. *Id.* Chaplain Gibbs went back into his office and a few minutes later the "Building 8 Clerk" entered Chaplain Gibbs' office. *Id.* At the conclusion of services, the officers at the security desk advised Mr. DePaola that Chaplain Gibbs wanted them to write Mr. DePaola an infraction for being out of bounds by attending Jumma but the officer refused to do so because Mr. DePaola was on their pass list. *Id.*

Mr. DePaola then asked the Building 8 Clerk why he was called to Chaplain Gibbs' office and was told that Chaplain Gibbs asked why Mr. DePaola was on the religious service pass list

and directed that Mr. DePaola be removed from the list.  ECF No. 26 at 12.  The following week, Mr. DePaola was not called for religious service.  *Id*.

On May 21, 2024, Mr. DePaola was called to Chaplain Gibb's office and the Islamic Coordinator and Imam of ECI, Mr. Magid, was also present.  ECF No. 26 at 12.  Chaplain Gibbs reiterated that Mr. DePaola could not attend services because of his refusal to designate a religious sect.  *Id*.  Mr. DePaola was given a memo that threatened him with an infraction for attending religious services.  *Id*.  Chaplain Gibbs introduced Mr. Magid and stated that he was brought in "to deal with the Muslims just like I am the Chaplain for all the Christians at ECI."  *Id*. at 12.

Mr. DePaola stated that there was only one Islam and Mr. Magid indicated his agreement with Mr. DePaola's understanding.  ECF No. 26 at 12.  Mr. DePaola asked Chaplain Gibbs why he could not go back to attending Jumma and other Islamic services, but Chaplain Gibbs noted that he needed to follow the policy.  *Id*.  Mr. DePaola argued that the religious service manual provided that the managing official could sign off his request and he would be permitted to attend services, but Chaplain Gibbs responded that, as the designee, he would not sign off because he would then have to do so for everyone.  ECF No. 26 at 12-13.  Mr. Magid also advised that he would not take the matter higher because he would also have to do that for everyone else.  *Id.* at 13.

When Mr. DePaola returned to Building 8, he was advised by the Clerk that Chaplain Gibbs called the Clerk to his office and handed him a memo, which he was directed to give to officers in the Building 8 control room, that confirmed that Mr. DePaola was not allowed to attend any religious services.  *Id.*

On July 22, 2024, Mr. Magid called Mr. DePaola to his office and asked whether he had been attending Jumma.  ECF No. 26 at 14.  Mr. DePaola advised that he was denied the ability to attend Jumma because of his inability to choose a sect.  *Id.*  Mr. Magid stated that he was trying to

teach people in the administration about Islam, but that it would take time, and he instructed Mr. DePaola to return to Jumma, and to designate a sect so that he could attend Jumma, because the missing of Jumma was a sin.  ECF No. 26 at 13-14.  Mr. DePaola responded that he would pray on the matter.  *Id*. at 14.

Chaplain Gibbs was transferred to the west compound at ECI and Chaplain Phillips was transferred to the east compound, where Mr. DePaola was housed. ECF No. 26 at 14.   On September 6, 2024, Mr. DePaola saw Chaplain Phillips and asked if he would permit him to attend Jumma.  ECF No. 26 at 14.  Chaplain Phillips directed Mr. DePaola to come to his office to discuss the matter but when Mr. DePaola went into the chaplain's office, he was directed to sign the Religious Registration Form and select Sunni as his sect so that he could attend Jumma.  ECF No. 26 at 14.  Mr. DePaola signed the form as directed and Chaplain Phillips changed Mr. DePaola's religious preference in OCMS to Sunni, and walked him to Jumma services. *Id*.  Since then, Mr. DePaola has been permitted to attend Islamic services.  *Id.*

Mr. DePaolo asserts that all Defendants violated his First Amendment right to practice his religion freely, Chaplains Gibbs and Kitchen retaliated against him based on the exercise of his First Amendment rights, all Defendants violated his Fourteenth Amendment right to Equal Protection, all Defendants violated his rights guaranteed under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[3] and all Defendants violated the Maryland Constitution and Declaration of Rights, Articles 24 and 36.  ECF No. 26 at 15.

As relief, Mr. DePaola seeks declaratory and injunctive relief as well as compensatory and punitive damages.  ECF No. 26 at 16-17.

---

[3]     42 U.S.C. § 2000cc-1(a) *et seq*.

B.    **Defendants' Response**

The DPSCS policies and procedures regarding religious practices by incarcerated individuals are outlined in the Religious Service Manual OPS. 140.0002. ECF No. 1-1.  DPSCS recognizes over thirty religions for congregational activities.  ECF No. 1-1 at 127.  Each group has unique needs and accommodations that are coordinated by DPSCS staff.  ECF No. 1-1 at 24–25.

The Religious Services Manual requires incarcerated individuals to register their religious preference so that they can be added to the appropriate pass list in order to attend regular and ongoing religious activities within DPSCS facilities.  ECF No. 1-1 at 18; ECF No. 31-3, ¶ 2. Registration of religious preference is done by completing a Religious Preference Registration Form. ECF No. 1-1 at 18.  Once the Religious Preference Registration form is complete, the inmate "shall be added to the appropriate pass list to attend regular, ongoing activities…" *Id.*  In order for an incarcerated individual to participate in his choice of religious activities, he needs to list the name of the religious sect whose services he wishes to attend.  ECF No. 1-1 at 127.

If an incarcerated individual's religious preference is not included on the Religious Preference Form, he may ask the Administrative Chaplain for recognition of that religion.  ECF No 31-3 at ¶ 8; ECF No. 1-1 at 22.  The Religious Services Manual outlines the steps for an incarcerated individual to petition for the recognition of a new religion or religious practice.  ECF No. 1-1 at 22.  The request is investigated to determine whether it should be granted.  ECF No 31-3 at ¶ 8.

Incarcerated individuals are prohibited from attending any religious activity of another religion unless approved by the Managing Official.  ECF No. 1-1 at 19.  Additionally, incarcerated individuals may not worship or participate in an activity if the individual is "not listed in the facility sign-up/count-out listing for that program." *Id*. at 33.  Once a Religious Preference Registration Form is complete, the individual "shall be added to the appropriate pass list to attend regular,

ongoing activities…" *Id*.  Chaplain Mohamed avers that the policy was adopted for the safety, security, and orderly administration of DPSCS facilities.  ECF No. 31-3 at ¶ 7 (Decl. Mohamed).

Mr. DePaola was provided with a Religious Preference Registration Form but refused to complete it, alleging that selecting a particular sect of Islam violates his religious beliefs because Islam should not be divided into sects.  *See* ECF No. 26, at 7–8.  The form lists eight different sects under Islam, each of which is officially recognized and approved for congregational worship within DPSCS facilities.  ECF No. 1-1 at 127; ECF No. 31-3 at ¶ 3.  Selecting a sect allows an individual to participate fully in religious practice while incarcerated.  *Id*.  The Religious Preference Form does not require a profession of belief in a specific sect's doctrine but merely an acknowledgment/observance of the religious group's practices.  *See* ECF No. 1-1 at 127.  The purpose of this policy is to assign passes and track who is attending activities within the facility. *See* ECF No. 1-1 at 14 ("Offenders shall be added to the appropriate pass list to attend regular, ongoing activities…"). The registration of religious preference is directly related to the needs of correctional staff to assign passes to attend religious activities within the facility.  *See* ECF No. 1-1 at 18.  The policy also prevents individuals from attending religious activities of different faith groups without prior approval, ensuring order and structure in religious programming.  *Id*. at 19. DPSCS policy endeavors to protect the rights of all incarcerated individuals to practice their religion without interference or disruption.  *See* ECF No. 1-1 at 33 ("Offenders who attend religious services shall show proper respect… Any act… which would tend to degrade a particular person or group may result in disciplinary action.")

Chaplain Mohammed explains that Sunni Muslims are the most populous Islamic Group at ECI.  ECF No. 31-3 at ¶ 5.  Sunni Muslims do not attend congregant activities with other religious groups, including other groups listed under Islam.  *Id*. at ¶ 6.  The Religious Services Manual provides that during Ramadan inmates may observe a fast where meals are missed.  ECF

No. 1-1 at 42.  During that time, food service provides an enhanced meal service to cover the meals missed during fasting.  *Id.*  Mr. DePaola informed Chaplain Kitchen that he did not want separate religious accommodations but wanted to attend the religious activities of one of the established Islamic groups.  ECF No. 26 at 9.

Lastly, Defendants offer that Mr. DePaolo did not file an ARP regarding his inability to receive accommodations during Ramadan in 2022.  ECF No. 31-4 at ¶ 5 (Decl. Derr).

<strong>STANDARDS OF REVIEW</strong>

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

When the moving party styles its motion as a motion to dismiss or, in the alternative, motion for summary judgment, as is the case here, and attaches additional materials to the motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the court, and the court can treat the motion as one for summary judgment.  *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th

Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011); *see Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023); *Putney v. Likin*, 656 F. App'x 632, 638–39 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). A party opposing the conversion of a motion to dismiss into one for summary judgment must, ordinarily, submit a Rule 56(d) affidavit setting forth the reasons for opposition. *Evans v. Tech Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). Even without a Rule 56(d) affidavit, the court may consider whether the nonmoving party has "adequately informed the [] court that the motion [for summary judgment] is [premature] and more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). The Fourth Circuit has emphasized that discovery is "broadly favored" in advance of reaching summary judgment and district courts are to afford pro se plaintiffs leniency in regard to the requirements of Rule 56(d). *Farabee v. Gardella*, 131 F.4th 185, 193-95 (4th Cir. 2025).

Nevertheless, a plaintiff "cannot simply demand discovery for the sake of discovery." *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 3d 331, 342 (D. Md. 2011).

Mr. DePaola filed a Rule 56(d) affidavit, stating generally that discovery is necessary so that he can further identify information and present facts as to how the named Defendants personally violated his rights and to support his claims he was discriminated against. ECF No. 22-1 at 4-5. He attached interrogatories and a request for production of documents. ECF No. 22-16. He also claims that discovery is necessary to "identify other relevant information which may lead to the discovery of any other relevant materials." ECF No. 22-1 at 5. Mr. DePaola does not explain how the foregoing information is necessary for him to present facts in opposition to the pending summary judgment motion nor does he identify the purportedly disputed facts that would necessitate discovery  Mr. DePaola has filed responses in opposition to the motion, offering no explanation as to how the foregoing information is necessary to his opposing the dispositive motion. Additionally, information regarding how the named Defendants personally violated Mr. DePaola's rights and/or facts supporting Mr. DePaola's claim regarding the inability to practice his faith are within his personal knowledge and he could present that information via affidavit or declaration. Lastly, Mr. DePaola's desire to uncover other unspecified relevant information is insufficient to explain how such information is essential to his opposition.

Additionally, Mr. DePaola's request is distinguishable from that of *Farabee*, where the pro se plaintiff failed to conform with the Rule 56(d) requirements but specifically argued that "summary judgement [was] premature because he had not yet had an opportunity to conduct discovery." *Farabee*, 131 F. 4th at 192. Mr. DePaola not only fails to identify a particular need for future discovery but also fails to advance the argument that summary judgment is premature. Mr. DePaola's case is further distinguishable from *Farabee* in that the plaintiff in *Farabee* could not "access legal materials, suffer[ed] from severe mental illness, and [was] institutionalized." *Id.*

14

at 197.  Mr. DePaola appears to be in full possession of his mental faculties and does not argue that he has had difficulty representing himself, nor does the court discern any such difficulties in his papers.  Considering the foregoing, the request for discovery is denied.  Consideration of the pending Motion shall therefore continue.

## DISCUSSION

Defendants have moved to dismiss the complaint or for summary judgment in their favor, arguing that:  (1) Defendants are entitled to Eleventh Amendment immunity for claims asserted against them in their official capacity; (2) Mr. DePaola is not entitled to money damages for his RLUIPA claim; (3) "Religious Services Department" is not a person amenable to suit under § 1983; (4) Mr. DePaola failed to exhaust  administrative remedies as to his claims arising in 2022; (5) Mr. DePaola fails to state a claim that his right to practice his religion was substantially burdened; (6) Defendants are entitled to summary judgment; (7) Mr. DePaola has failed to allege any facts as to Defendants Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Correction J. Phillip Morgan, Warden William Bailey and Laura Armstead; (8) Defendants Gibbs and Kitchen did not retaliate against Mr. DePaola; and (9) Defendants are entitled to qualified immunity.  ECF No. 31-1.

### A.    Exhaustion

Defendants raise the affirmative defense that Mr. DePaola has failed to exhaust his administrative remedies properly as to claims arising in 2022.  If Mr. DePaola's claims were not properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.  The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd,* 98 F. App'x 253 (4th Cir. 2004).

Mr. DePaola's RLUIPA claims, like all prisoner conditions claims, must be exhausted before they can be brought in federal court.  *Tillman v. Allen*, 187 F.Supp. 3d 664, 672 (E.D. Va. 2016) (dismissing without prejudice RLUIPA claims for failure to exhaust under the PLRA); *Germain v. Shearin*, 653 Fed. App'x 231 (4th Cir. 2016) (holding inmate who brought claim under RLUIPA failed to exhaust his administrative remedies as required by the PLRA);  *Corpening v. Hargrave*, No. 5:14-CV-122-FDW, 2015 WL 2168907, at *2 (W.D.N.C. May 8, 2015) (citing *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060–61 (9th Cir. 2007) (holding that the PLRA requires exhaustion of administrative remedies before an action may be brought under any federal law)).

Although exhaustion under § 1997e(a) is not a jurisdictional prerequisite, the plaintiff must nonetheless exhaust before this court will hear the claim.  *See Jones v. Bock*, 549 U.S. 199, 215–16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 682 (4th Cir. 2005).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily

resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 286 F. Supp. 2d at 530.

Because the court may not consider an unexhausted claim, *see Jones*, 549 U.S. at 220, in this very real sense, exhaustion prior to federal suit is mandatory. *Ross v. Blake*, 578 U.S. 632, 639 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). Importantly however, the court must ensure that "any defects in exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Moreover, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); *see Ross*, 578 U.S. at 637. An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar-Avellaveda*, 478 F. 3d at 1225); *Kaba*, 458 F.3d at 684.

Inmates housed at an institution operated by the Maryland Department of Public Safety and Correctional Services may avail themselves of the administrative grievance process which is designed for "inmate complaint resolution." *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs ("COMAR" 12.07.01.01B(1) (defining ARP).

The ARP process consists of multiple steps.  For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" COMAR 12.02.28.05(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(m) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility."  Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later.  COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame.  The prisoner has 30 days to file an appeal to the Commissioner of Corrections.  COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within 30 days.  COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B).  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.  C.S. § 10-207(b)(1); *see* COMAR 12.07.01.06B.  An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).

Here, it appears that Mr. DePaola was aware of the administrative grievance process and the process was available to him, as Mr. DePaola filed other ARPs in 2021, 2022, and 2023.  *See* ECF No. 31-4.  But there is no record that Mr. DePaola filed any ARPs concerning his access to religious programming in 2022.  ECF No. 31-4, ¶ 5.  Nevertheless, Mr. DePaola claims that he filed two ARPs in 2022 but did not receive a response and therefore he did not have a case number with which to file an appeal and the administrative process was therefore unavailable to him.  As such, Defendants have not shown as a matter of law that Mr. DePaola failed to exhaust his available

administrative remedies as to his access to religious programming in 2022 and the court declines to grant Defendants' motion on this basis.

### B.    Religious Services Department

Two elements are essential to sustaining an action under § 1983.  The plaintiff must demonstrate that:  (1) he suffered a deprivation of "rights, privileges or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law.  *West v. Atkins*, 487 U.S. 42, 48 (1988). Naming institutions or using the term "staff" or the equivalent as a name for alleged defendants, without naming specific staff members, is insufficient to state a claim against a "person" in a § 1983 action.  *Harden v. Green*, 27 F. App'x 173, 178 (4th Cir. 2001) ("The medical department of a prison may not be sued, because it is not a person withing the meaning of § 1983," citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989) (other citations omitted)). Because Defendant "Religious Services Department" is not a "person" subject to suit or liability under § 1983, Mr. DePaola's complaint against "Religious Services Department" must be dismissed.

### C.    Personal Participation

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that:  (1) the supervisor had actual or constructive knowledge that his subordinate was

engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

In the suit, Mr. DePaola does not attribute any specific action or inaction to Defendants Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Correction J. Phillip Morgan, Laura Armstead, or Warden William Bailey that resulted in a constitutional violation. To the extent that Mr. DePaola alleges that any of these Defendants ignored his complaints when they processed his grievances, such a claim is unavailing as the denial of a grievance does not alone give rise to liability. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.") And, Mr. DePaola provides no specific allegations as to Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Correction J. Phillip Morgan, Laura Armstead, or Warden William Bailey. Thus, Mr. DePaola fails to state a claim against these Defendants. *See Langford v. Joyner*, 62 F.4th 122, 125-26 (4th Cir. 2023).

Moreover, to the extent that Mr. DePaola intended to sue Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Correction J. Phillip Morgan, Laura Armstead, and Warden William Bailey in their capacity as supervisors, he cannot succeed. As discussed, the doctrine of respondeat superior does not apply in § 1983 claims.

20

*See Love-Lane*, 355 F.3d at 782 (holding that there is no respondeat superior liability under §
1983).

Mr. DePaola has failed to plead facts that, if proven, amount to supervisory indifference to
or tacit authorization of misconduct by employees at ECI.  Thus, his assertions do not demonstrate
any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise
to § 1983 liability.  Therefore, on this ground, the suit is subject to dismissal as to Defendants
Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor,
Commissioner of Correction J. Phillip Morgan,  Laura Armstead, and Warden William Bailey.

## D.    Religious Claims

"Lawful incarceration brings about the necessary withdrawal or limitation of many
privileges and rights, a retraction justified by the considerations underlying our penal system."
*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  However, prison inmates retain a right to
reasonable opportunities for free exercise of religious beliefs, without concern for the possibility
of punishment.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972); *see Heyer v. United States Bureau of
Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (recognizing that prisoners enjoy certain constitutional
rights).

As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause
of the First Amendment, a Plaintiff must allege that: (1) he holds a sincere religious belief; and
(2) a prison practice or policy places a substantial burden on his ability to practice his religion.
*See Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Rev. Bd. of Indiana
Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)); *see Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir.
2018).  A substantial burden is placed upon a prisoner's religious exercise when it "put[s]
substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*,
450 U.S. at 718.

21

Nevertheless, prison restrictions that impact on the free exercise of religion, but are related to legitimate penological objectives, do not run afoul of the constitution. *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987). The court is required to give "substantial deference to prison officials, especially . . . the impact of guards, inmates, and resource allocation. *Firewalker-Fields v. Lee*, 58 F.4th 104, 115 (4th Cir. 2023) citing *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

Mr. DePaola's religious practices are provided even greater protection under RLUIPA. Therefore, if a Plaintiff is unable to sustain his RLUIPA claim, there is no need for the court to consider separately the claim under the First Amendment, as the claim will necessarily fail there too. *See, e.g., Tillman*, 187 F. Supp. 3d at 675; *Lovelace v. Lee*, 472 F.3d 174, 198 (4th Cir. 2006).

In relevant part, RLUIPA states, 42 U.S.C. § 2000cc-1(a):

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005); *see Holt v. Hobbs*, 574 U.S. 352, 357-58 (2015); *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace*, 472 F.3d at 186. Enactment of RLUIPA restored religious free exercise rights to prisoners, similar to those enjoyed by those who are not incarcerated. *See Cutter*, 544 U.S. at 715–17.

A plaintiff seeking relief under RLUIPA has the initial burden to show that the challenged policy "implicates his religious exercise." *Holt v. Hobbs*, 574 U.S. 352, 360 (2015); *see Richardson v. Clarke*, 52 F.4th 614, 622 (4th Cir. 2022). RLUIPA defines "religious exercise" as

"any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *Holt*, 574 U.S. at 358; *Smith*, 578 F.3d at 251.

Under RLUIPA, an inmate initially must show that the challenged policy substantially burdens the exercise of his "sincerely held religious beliefs." *Wright v. Lassiter*, 921 F.3d 413, 418 (4th Cir. 2019); *see Carter*, 879 F.3d at 139–40; 42 U.S.C. § 2000cc-2(b). A prison regulation imposes a substantial burden on religious belief when it places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187; *see Richardson*, 52 F.4th at 622.

If a plaintiff makes the requisite showing, "the court proceeds to the second stage to determine whether the prison's policies are justified despite the imposed burden." *Richardson*, 52 F.4th at 622. And "the policies must represent the least restrictive means of furthering a compelling governmental interest." *Id.*; *see Holt*, 574 U.S. at 357–58; 42 U.S.C. § 2000cc-1(a).

Mr. DePaola need not prove that the practice at issue is "required or essential" to his religion, but he must at least "demonstrate that the government's denial of a particular religious. . . observance was more than an inconvenience to [his] religious practice." *Tillman*, 187 F. Supp. 3d at 673 (citations omitted). "'[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden.'" *Id.* (quoting *Shabazz v. Virginia Dep't of Corr.*, No. 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013)).

As shown, RLUIPA "prescribes a shifting burden of proof for inmate religious exercise claims." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015), *as amended* (July 7, 2015). A

prisoner must initially "demonstrate that the prison's policy exacts a substantial burden on religious exercise," and then the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id.* Notably, prison security is a compelling interest. *Cutter*, 544 U.S. at 725, n. 13. Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and must exercise restraint in cases dealing with the administration of prisons. *Procunier v. Martinez*, 416 U.S. 396, 405 (1974).

Deference is afforded to prison administrators who must regulate the prison while balancing the prisoners' rights to free exercise of religion with the maintenance of the security of the institution. *Cutter*, 544 U.S. at 723. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline consistent with considerations of costs and limited resources." *Cutter* 544 U.S. at 723 (citing legislative history).[4]

---

[4] Additionally, RLUIPA does not support a claim for monetary damages against state officials, such as Defendants. *Sossamon v. Texas*, 563 U.S. 277, 293 (2011) (holding that acceptance of federal funds by States does not amount to consent to waiver of sovereign immunity to RLUIPA claims for monetary damages against state employees in their official capacities); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (holding RLUIPA does not authorize a claim for money damages against a state employee sued in their individual capacity). As such, Mr. DePaola's only remedies under RLUIPA are equitable. The record reflects that Mr. DePaola has completed a Religious Preference Form indicating his desire to attend congregate prayer services with the Sunni Muslims and has done so therefore his request that he be permitted to attend congregate services is moot. Under these circumstances, Mr. DePaola cannot maintain a claim based on RLUIPA, and Defendants are entitled to summary judgment on this basis on the RLUIPA claim. *See Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007) (holding that transfer or release moots claim for injunctive relief under RLUIPA.)

Additionally, under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state

Mr. DePaola asserts that a substantial burden was placed on his religious practice when he was denied religious services because he refused to designate a sect on his Religious Preference Form. He has failed, however, to demonstrate that a substantial burden was placed on his religious practice in violation of RLUIPA.

The process requiring registration to participate in religious programming is not new to the prison context. As long ago as 1997, the United States Court of Appeals for the Second Circuit discussed the rationale for such a policy:

> While inmates are not stripped of their constitutional rights simply by virtue of their imprisonment, *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974), including their right to religious freedom, *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), they retain only those rights consistent with legitimate penological objectives, *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995), and reasonable limitations on the accommodation of religious practices necessary to achieve those objectives are permitted. Registration is one such limitation.
>
> Registration of religious affiliation at Woodbourne entails only a modest act of commitment by the inmate, while serving several legitimate penological interests. By registering, the inmate formally declares his religious affiliation. This has significance because prison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion. *See, e.g., Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards).
>
> Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. Registration also allows prison officials to gauge the interest in any particular religion on the part of the inmate population and thus decide whether a "congregation" should be allowed. Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if

---

itself. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-204(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Accordingly, Defendants are immune from suit for actions taken in their official capacities and such claims for monetary damages asserted against them in their official capacity must be dismissed.

and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial "bright line" that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.

*Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096–97 (2d Cir. 1997). Sect specific registration has also been examined. *See, e.g.*, *Williams v. King*, 56 F.Supp.3d 308 (S.D.N.Y. 2014)(discussing requirement to register as Shiite Muslim). Requiring an inmate to complete a religious registration form "is, at best, an inconvenience, but does not rise to the level of a burden" on plaintiff's rights. *See Spavone v. City of New York*, 420 F.Supp.2d 236, 240 (S.D.N.Y. 2005) (plaintiff was not substantially burdened by policy that permitted inmates to only participate in one religion); *see also Jones v. Annucci*, No. 16-CV-3516 (KMK), 2018 WL 910594 (S.D.N.Y. February 14, 2018) (plaintiff's First Amendment rights were not substantially burdened when Muslim inmate was required to register as "Shia" in order to attend certain religious festivals).

There is no allegation, much less demonstrable fact, that any correctional staff prohibited Mr. DePaola from participating in religious services. The evidence clearly demonstrates that inmates are permitted congregate prayer when they designate a group with whom they desire to pray. Mr. DePaola seeks to participate in the religious services of an existing Islamic sect without registering for that sect. ECF No. 26 at 9 ("I am not asking for a separate service, I practice the same Islam as every Muslim who believes in Allah, his Prophets and follows the Holy Qur'an and Sunnah."). He acknowledges that Chaplain Kitchen advised him that he could register under any sect, even one that he did not sincerely believe in, to access religious services. *See* ECF No. 26 at 9 ("Def. Kitchen stated… all I had to do is list any sect, whether I sincerely believed it or not, and I could go on and participate in religious services."). Mr. DePaola's ability to attend congregate services was not contingent on his accepting a doctrinal distinction but rather on simply registering

his preference administratively for logistical and security purposes so that he could be added to the appropriate pass list. DPSCS's policy did not compel Mr. DePaola to modify or violate his religious beliefs. The policy provides an administrative mechanism to access religious services. Simply put, Mr. DePaola had two alternatives to manage his desire for congregate prayer. He could identify the group of Muslims he wished to pray with or find other Muslims who shared the desire for non-sectarian congregate prayer, request their recognition as an unaffiliated Islamic group, and then pray together. Mr. DePaola made no effort to pursue this second accommodation. Because Mr. DePaola has not demonstrated that DPSCS's registration policy substantially burdens his religious exercise, his Free Exercise and RLUIPA claims fail, and Defendants are entitled to summary judgment.

Further, Mr. DePaola was able to engage in fasting during Ramadan once he completed a Religious Designation Form identifying himself as Muslim. After he identified as Muslim, he was provided the Ramadan meal tray with which to break his fast. Prior to Mr. DePaola's completion of the Religious Designation Form, he had access to commissary items to break his fast. While Mr. DePaola states that his access to commissary items was insufficient, he does not explain how or why those items were insufficient. He has not demonstrated that his religious practice was substantially burdened by his not being added to the Ramadan meal list. *See DeJesus v. Bradt*, 174 F. Supp. 3d 777, 785–87 (W.D.N.Y. 2016) (finding no substantial burden to religious practice under the First Amendment where Plaintiff had access to food stored in his cell); *Evans v. Snyder*, No. 2:11-CV-492, 2014 WL 1369301, at *4 (W.D. Mich. Mar. 31, 2014), *aff'd* (Mar. 19, 2015) (holding Plaintiff was not denied participation in fast and that denial of snack bag during fasting days was at most an inconvenience, particularly given that Plaintiff had the opportunity to purchase his own food or snacks from the prison store.)

Even if Mr. DePaola had established that completion of the Religious Registration Form constituted a substantial burden to his religious practice, Defendants would be entitled to summary judgment as the form serves the compelling government interests of safety and security within the prison setting. Requiring inmates to register their religious affiliation serves legitimate penological interests. *See Jackson-Bey v. Hanslmaier*, 115 F.3d at 1096-97:

> Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. Registration also allows prison officials to gauge the interest in any particular religion on the part of the inmate population and thus decide whether a "congregation" should be allowed. Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed.

Defendants explain that the policy requiring identification with a religious group for congregate prayer is born out of security concerns to allow adherents of particular tenets to worship together. Prisoner and officer safety are legitimate concerns. *Jehovah v. Clarke*, 798 F.3d 169, 178 (4th Cir. 2015).

In short, Mr. DePaola failed to provide evidence that defendants intentionally interfered with his religious practices. There is simply no evidence that any of the Defendants interfered with Mr. DePaola's religious practices. Given the threat to the security and safety of the institution when inmates gather, Defendants had compelling reasons to require that inmates designate their affinity to a particular religious group in order that they be monitored and added to the proper pass lists. This was in accordance with DPSCS policies, which apply to all inmates seeking to participate in religious services, regardless of their denomination or sect. The policy does not distinguish or discriminate against an inmate based on religious beliefs. Even if requiring Mr. DePaola to designate a religious group somehow constituted interference with his religion, such a requirement was reasonably related to legitimate penological interests because, in the prison

setting, maintaining the security and safety of inmates constitutes a compelling government interest. *McRae v. Johnson*, 261 F. App'x 554, 558 (4th Cir. 2008).

Lastly, Mr. DePaola's claim fails because he cannot demonstrate that the DPSCS policy is the cause of the alleged burden on the exercise of his religion. Under both RLUIPA and the First Amendment, Mr. DePaola must show that Defendants imposed a substantial burden in order to be held liable. *Wright*, 921 F.3d at 419. The burden to the religious practice must have been imposed by Defendant and not "self-imposed" by the plaintiff himself. *Id.* citing *Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016); *see also Firewalker-Fields*, 58 F. 3d at 120, fn 4. In *Wright*, the Fourth Circuit rejected the Plaintiff's RLUIPA and First Amendment claims regarding the denial of communal Rastafarian meals because the Plaintiff could not demonstrate that Defendants caused the substantial burden to his religious practice. "Wright's causation problem stems from the fact that he has requested communal gatherings and feasts. There is no such thing as a community of one . . . ." *Id.* As in *Wright*, Mr. DePaola was always free to request to worship with other Muslims who agreed with his beliefs regarding the prohibition on designating sects of Islam, but he has failed to adduce enough evidence to permit a reasonable fact finder to conclude that such other inmates existed.

In light of the foregoing, Chaplains Kitchen, Phillips, and Gibbs are entitled to summary judgment regarding Mr. DePaola's religion claims.

### E.    Retaliation

Mr. DePaola claims that he was retaliated against for filing a grievance regarding the exercise of his religious rights. Mr. DePaola filed a grievance on April 11, 2023, requesting a change to the policy requiring incarcerated individuals to register for a particular religion in order to participate in its activities. ECF No. 31-4 at 8–9. Mr. DePaola alleges in his Amended Complaint that, after he filed his ARP, Chaplain Kitchen informed him "You are in prison, the

policy is what it is.  If you don't list a sect and sign off withdrawing your ARP, your ARP will be denied, and nothing will be done."  ECF No. 26, at 9.

To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that:  (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *cf. Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (outlining elements of a Title VII retaliation claim) .

A plaintiff can establish retaliatory conduct if the defendant took an action against the plaintiff that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quotation marks and citation omitted).  A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action.  *See Constantine*, 411 F.3d at 501.  The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity, and that the retaliatory act was temporally proximate to that activity. *Id.*

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'"  *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).  As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation.  *White v. White*, 886 F.2d 721, 724 (4th Cir. 1989).  Moreover, a retaliation claim fails if there is a legitimate reason for the alleged retaliatory action.  *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Mr. DePaola fails to allege, much less establish, that Defendants engaged in any retaliatory action that adversely affected his First Amendment rights.  To the contrary, Mr. DePaola was repeatedly and consistently informed that the sole requirement for participating in religious activities was the completion of the Religious Preference Form and, to the extent he sought congregate services, to identify the group with which he wished to pray.  There is simply no evidence that any of the named defendants forced Mr. DePaola to complete the Religious Designation Form or retaliated against him in any way for practicing his faith or for filing an ARP seeking to change the policy regarding the completion of the Religious Designation Form.  The staff who interacted with Mr. DePaola were tasked with managing his needs and the needs of the institution relative to the safety and security concerns of the institution, including authorizing movement among inmates, in furtherance of penological objectives.

Mr. DePaola's assertions that Defendants' conduct was retaliatory is an impermissible effort to bolster a frivolous complaint by adding allegations of retaliation.  *See Brown v. Carpenter*, 889 F. Supp. 1028, 1034 (W.D. Tenn. 1995) ("A plaintiff cannot bootstrap a frivolous complaint with conclusory allegations of retaliation.").  As such, Chaplains Kitchen, Phillips, and Gibbs are also entitled to summary judgment as to Mr. DePaola's retaliation claim.

### F.    Injunctive Relief

Mr. DePaola also seeks injunctive relief.  A party seeking a preliminary injunction or temporary restraining order must establish the following elements:  (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request for injunctive relief.

For the reasons discussed above, Mr. DePaola has failed to demonstrate the likelihood of success on the merits.  Therefore, his request for injunctive relief must be denied.

### G.    State Law Claims

In addition to his federal constitutional and statutory claims, Mr. DePaola asserts state law claims.  This court has original subject matter jurisdiction over any federal claim, pursuant to 28 U.S.C. § 1331(a)(1), which "confers upon district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'"  *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012).  However, the court does not have original jurisdiction over Mr. DePaola's State law claims, and so the court is authorized only to resolve those claims pursuant to the grant of supplemental jurisdiction in 28 U.S.C. § 1367(a) which provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Pursuant to § 1367(c)(3) however, a district court "may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction."  In *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995), "[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished."  *See also ESAB Group, Inc.*, 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including ... where the court dismisses the claims over which it has original jurisdiction.").  "[U]nder the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case ... provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met."  *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001).

In the absence of viable claims that come within federal question jurisdiction, the court exercises its discretion and declines to exercise supplemental jurisdiction over Mr. DePaola's state law claims.  Those claims are dismissed without prejudice.[5]

**CONCLUSION**

For the foregoing reasons, the Defendants' motion is granted.  The Complaint is dismissed as to Defendants Secretary Carolyn Scruggs, Deputy Secretary Annie Harvey, IGO Director F. Todd Taylor, Commissioner of Correction J. Phillip Morgan, Warden William Bailey, Laura Armstead, and "Religious Services Department."  Summary judgment is granted in favor of Chaplains Kitchen, Phillips, and Gibbs as to Mr. DePaola's claims of denial of religious services and retaliation.  Mr. DePaola's state law claims are dismissed without prejudice.  Mr. DePaola's request for injunctive relief is denied.

A separate order follows.


Date:  July 16, 2025                              _____/s/_____
                                                        DEBORAH K. CHASANOW
                                                        United States District Judge

---

[5]     The court need not address Defendants' qualified immunity defense.